UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANTHONY CONDRA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case number 4:08cv0161 TCM |
| ) | |
| SERVICE EMPLOYEES ) | |
| INTERNATIONAL UNION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This case is before the Court on the opposed motion for summary judgment filed by Service Employees International Union ("SEIU"), the defendant in an amended complaint filed by plaintiff, Anthony Condra, alleging SEIU violated 42 U.S.C. § 1981 by reneging on an agreement to compensate him for accrued vacation and leave time and by terminating his employment based on an affidavit he gave in support of two other employees' claims against SEIU for racial discrimination.[1]

## Background

Plaintiff began work for SEIU in St. Louis in January 1997 as a senior organizer. (Def. Stat. of Facts[2] ¶ 1.) He was promoted that year to the position of campaign coordinator

---

[1]Plaintiff alleged in Count I retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17. This count was earlier dismissed as time-barred.

[2]The citation to "Def. Stat. of Facts" refers to those facts to which Plaintiff replied that he had "no response." Local Rule 4.01(E) of the Eastern District of Missouri requires a party opposing a motion for summary judgment to "include a statement of material facts as to which the party contends a genuine issue exists." "All matters set forth in the statement of the movant shall be deemed

and supervised SEIU organizing campaigns in Ohio and Michigan. (Id. ¶ 3.) He was to work out of an office in Detroit, Michigan. (Id. ¶ 4.) Consequently, he moved to Detroit, where he rented and furnished an apartment in a nearby suburb. (Id. ¶¶ 6, 7.) Plaintiff was reassigned in the Fall of 2001 and returned to St. Louis. (Id. ¶ 8.) SEIU paid for his furniture and other belongings, weighing over 9,000 pounds,[3] to be moved in October from Michigan to St. Louis. (Id. ¶ 9.)

Plaintiff submitted a 74-paragraph affidavit on May 30, 2003, in support of two African-American women's employment discrimination case against SEIU. (Comp. Ex. 3; Def. Stat. of Facts ¶ 14.)

Plaintiff was informed on October 20, 2003, that his position in St. Louis would not be funded after December 31, 2003. (Def. Ex. D-4.) The termination date was extended to June 30, 2004, pursuant to a separation agreement Plaintiff signed on February 2, 2004. (Def. Stat. of Facts ¶ 16.) This agreement, phrased as a letter to Plaintiff's representative and signed by him and SEIU's chief of staff, reads, in relevant part:

> 1. [Plaintiff] would to [sic] be paid by SEIU at his current rate of pay through June 30, 2004 . . . . His last day of employment will be June 30, 2004.

---

admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D. Mo. L.R. 4.01(E). Consistent with this Rule, the Court will deem admitted those alleged facts to which Plaintiff answered "no response." See **Jones v. United Parcel Serv., Inc.**, 461 F.3d 982, 991 (8th Cir. 2006) (affirming as proper district court's decision to deem admitted party's statement of facts on grounds that opposing party's response did not comply with local rules directing that response specifically controvert any facts not admitted).

[3]The exact number of pounds was 9,360 for furniture and other belongings with a value of $50,000. (Def. Ex. B-2.) SEIU paid $3,712.69 to have these items moved from Michigan to Missouri. (Id.)

> 2. Consistent with SEIU's policy on severance benefits for managers, [Plaintiff] would be eligible for six weeks severance pay from SEIU.
>
> 3. SEIU will pay [Plaintiff] for all accrued unused vacation, less standard deductions, consistent with SEIU's policy, provided all required leave and activity reports are completed and sent to Human Resources before his last day of employment on June 30, 2004.
>
> . . .
>
> 5. SEIU will not oppose any application by [Plaintiff] for unemployment compensation benefits for the period beginning July 1, 2004.
>
> . . .
>
> [The agreement] represents a full complete resolution to all matters or claims that have been raise [sic] or could have been raised by [Plaintiff] that relates to or arises out of his employment with and/or separation from SEIU and that are based on events that occurred prior to this agreement to these terms. These terms would constitute the entire understanding between us concerning the matters described in number paragraphs 1 through 5 above. No other promises or agreements would be made by either party to cause the this [sic] agreement.
>
> We would assume that the claims this agreement would resolve would include assertions under Title VII of the federal Civil Rights Act of 1964, the federal Americans with Disabilities Act, the federal Age Discrimination in Employment Act, the federal Family and Medical Leave Act, or state or District of Columbia fair employment practices statutes.
>
> . . . In good faith, and notwithstanding our earlier notice to [Plaintiff] that his employment would terminate on December 31, 2003, SEIU will continue to pay [Plaintiff] while he considers this agreement, up to January 4, 2004.

(Def. Ex. A-1.) In his answers to SEIU's interrogatories, Plaintiff summarized this agreement as "SEIU [will] pay me at my salary rate through June 30, 2004, and continue employment for six weeks severance pay, and I [would] be paid for all unused vacation and maintain my

benefits until my end date, and then receive unemployment if thereafter unable to find work." (Def. Ex. E at 4.)

On February 10, 2004, Plaintiff was forwarded a supply of "SEIU Weekly Expense, Activity and Vacation/Leave Reports" so that he could "submit reports through the end of June 2004." (Pl. Ex. 1.) Ten days later, he was notified that his leave file did not include a number of reports, including ones for 1997, 1998, 1999, 2000, 2001, and 2003. (Pl. Ex. 2.)

On June 30, Plaintiff submitted 252 reports dated either that day or the day before. (Def. Ex. A-6.) The first report was for the first week he worked for SEIU, January 20, 1997, to January 26, 1997, and sought reimbursement for a per diem of $32 for seven days. (Id.) The last report was for the three days worked in the week beginning June 28, 2004. (Id.) With few exceptions,[4] the reports fall into one of three categories. (Id.) The first category are reports requesting a per diem of $32.00 for each of the seven days of the week for work for Local 79 in Detroit. (Id.) The second category does not list a per diem but lists work for the Central Region and mileage of ten miles per day for five days a week. (Id.) The third category begins with the week of March 25, 2002, and is for work "on assignment in St. Louis" and requests a per diem for five days each week. (Id.) In this third category, the per diem increases to $35 in the week beginning December 23, 2002. (Id.) All reports

---

[4]The exceptions are reports in which Plaintiff listed an location he was at for a few days. For instance, a report filed for the week beginning March 2, 1998, listed three days in Michigan and two in the District of Columbia.

routinely seek per diem reimbursements for holidays, including Christmas, July 4, and the Memorial and Labor Day weekends. (Id.)

Plaintiff had previously submitted other expense reports. (Def. Ex. A-7.) Generally, these reports do not duplicate the weeks listed in the reports submitted in June 2004. Generally, they do describe the same work. For instance, in March 1998, Plaintiff submitted an expense report for the week beginning January 5, 1998, for work at Local 79's office in Detroit. This week was not included in his June 2004 submissions. It sought reimbursement of $14.53. A report for the week beginning December 22, 1997, describes four days of work at the Detroit office, excluding December 25, described as a holiday.

The SEIU policy in effect at the time Plaintiff was terminated and when he signed the agreement provided that SEIU managers and officers could carry over up to ten days of unused vacation into their next anniversary year.[5] (Def. Ex. A-4.) Another policy, an Expense and Reimbursement Policy, in effect from 2002 to 2004, provided that a combined meal and per diem expense of $32 per day was allowed for staff "when traveling overnight for work-related purposes." (Def. Exs. D ¶ 6, D-3 at 2.) No receipts needed to be produced when this option was chosen, compared to the option of being reimbursed up to $45 a day for meals when the expenditures were supported by receipts. (Def. Ex. D-3 at 1.) The policy also provided that if an out-of-town assignment was of a such duration that the employee stayed in an apartment with a kitchen or with friends or relatives the employee

---

[5] The policy was revised on February 4, 2002.

could be reimbursed up to $120 per week for food or groceries if the request was supported by receipts. (Id. at 2.)

On July 20, 2004, Plaintiff's unused vacation pay was calculated. (Def. Exs. B. ¶ 3, B-1.) Plaintiff's assertion that he had used no vacation days the previous year was accepted; thus, he was credited with ten days of unused vacation. (Def. Ex. B ¶ 3.) It was also assumed that he had taken no vacation days since his anniversary date of January 20, 2004, until June 30, 2004, his last day of employment and had not taken his birthday as a leave day. (Id.) These assumptions and calculations resulted in a total of 139.95 hours of unused leave and a payment of $6,333.77, less standard deductions for a net of $4,117.40. (Id.; Def. Exs. C ¶ 2, C-[3].) This net amount was paid by direct deposit to the same account as was a net of $5,653.31 in severance pay. (Def. Ex. C ¶¶ 2-4.)

Plaintiff testified in his deposition that Grant Williams told him that he (Williams) had been paid vacation and unused sick days when he left SEIU. (Def. Ex. A at 41.) When Becky Belcore "cashed out," "[s]he got everything," including a per diem. (Id. at 41, 77.) Dan Schlademan "cashed out" when he left SEIU. (Id.) Specifically asked if he knew of any individuals that were treated differently than he by SEIU "[a]s far as cashout," Plaintiff replied that he did not. (Id. at 42.) His basis for believing that Williams, Belcor, and Schlademan were paid for unused sick leave was that it was the practice of managers to do so. (Id. at 79.) Conversely, Carole Sanders, the Employment Systems Coordinator who calculates the leave for employees who are leaving SEIU, avers that neither Williams nor Schlademan were paid for accrued sick leave, such payment being against SEIU policy, but

- 6 -

were paid for unused vacation, including ten days of carried-over unused vacation leave. (Def. Exs. B ¶¶ 2, 5, B-3, B-4.) Schlademan was paid in February 1998; Williams was terminated in January 2002 and paid in March 2002. (Def. Exs. B-3, B-4.) Belcore was not paid for any leave, having failed to submit any leave reports. (Def. Ex. B ¶ 6.)

SEIU argues in its pending motion that it is entitled to summary judgment because (a) Plaintiff released all his employment-related claims against SEIU by signing the agreement and (b) the claims are without merit. Plaintiff disagrees.

## Discussion

"'Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" **Loeb v. Best Buy Co.**, 537 F.3d 867, 871 (8th Cir. 2008) (quoting Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007)). When making this determination, the Court views the evidence, and any reasonable inferences therefrom, in the light most favorable to Plaintiff. **Id.** In opposing a properly-supported motion for summary judgment, Plaintiff may not "merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." **Bass v. SBC Commc'ns, Inc.**, 418 F.3d 870, 872-73 (8th Cir. 2005). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" **Id.** (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). And, although "summary judgment should seldom be granted in the context of employment actions, as such

actions are inherently fact based," **Mayer v. Nextel West Corp.**, 318 F.3d 803, 806 (8th Cir. 2003) (internal quotations omitted), there is "no separate summary judgment standard . . . for discrimination or retaliation cases . . . ," **Wallace v. DTG Operations, Inc.**, 442 F.3d 1112, 1118 (8th Cir. 2006).

The Agreement. In exchange for an additional six months of employment, payment of severance benefits and unused annual leave, no opposition to his receipt of unemployment benefits, and a neutral reference, Plaintiff agreed in February 2004 to release any employment-related claims he had against SEIU. SEIU argues this release forecloses this action.

Under Missouri law,[6] settlement agreements are governed by contract law. **Chaganti & Assocs., P.C. v. Nowotny**, 470 F.3d 1215, 1221 (8th Cir. 2006); **Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.**, 347 F.3d 1052, 1053 (8th Cir. 2003); **In re General Am. Life Ins. Co. Sales Practices**, 357 F.3d 800, 804 (8th Cir. 2004). "'The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation.'" **Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.**, 528 F.3d 556, 561 (8th Cir. 2008) (quoting L.B. v. State Comm. of Psychologists, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)). "'Mutuality of agreement' requires 'a mutuality of assent by the parties to the terms of the contract,' i.e., a

---

[6]The parties do not address whether Missouri law governs the resolution of the release issue. The agreement was apparently signed by Plaintiff when in Missouri. Absent any reference to another state having any significant contact with the transaction, the Court will apply Missouri law.

'meeting of the minds.'" **Nowotny**, 470 F.3d at 1221 (8th Cir. 2006) (quoting L.B., 912 S.W.2d at 617). Mutuality of obligation "exists whenever there is consideration." **Id.**

It is undisputed that Plaintiff and the Kirk Adams, SEIU's chief of staff, were, at all times relevant, competent to contract. Plaintiff's release of employment-related claims against SEIU is a proper subject matter for the contract. The consideration of six months' additional employment[7] is certainly legal consideration.[8] The terms to which Plaintiff and Adams mutually agreed included a release by Plaintiff of "all matters or claims that have been raise[d] or could have been raised by [him] that relate to or arise out of his employment with and/or separation from SEIU and that are based on events that occurred prior to this agreement . . . ." (Def. Ex. A-1 at 2.) Plaintiff's affidavit in support of two former SEIU employees' discrimination claim was made eight months before he signed the agreement. Although he would then not have known whether SEIU was going to pay his eight years of per diem and mileage requests or to pay him for unused sick leave in July 2004, "a person, as a matter of contract, may release, in exchange for consideration []he deems adequate, claims existing at the time but not known to [him]." **In re General Am.**, 357 F.3d at 804. According to the terms of the agreement, Plaintiff released any pending or future claims

---

[7]Plaintiff testified in his deposition that he earned approximately $93,000 to $98,000 annually at the time he left SEIU. One-half the lower amount would be $46,500.

[8]It is not clear from the record whether the other promises, e.g., payment of severance benefits and unused vacation leave, a neutral reference, and an agreement not to oppose Plaintiff's receipt of unemployment benefits, were obligations that SEIU had under its policies and its termination of Plaintiff's employment on the grounds of lack of funding regardless of the agreement.

against SEIU in exchange for, inter alia, six months continued employment and approximately $45,000 in wages.

Plaintiff argues that the agreement only released his claims under the specific statutes cited. This argument is unavailing. It is clear from a reading of the agreement that the cited statutes are examples of the claims Plaintiff has released. The language in the preceding paragraph includes a release of "*all* matters or claims" arising from Plaintiff's employment with SEIU. Had the parties intended that the release include only the cited statutes, such intention had to be clearly expressed. See **Bath Junkie Branson**, 528 F.3d at 562 ("'Any reservation or limitation as to the scope of a settlement agreement must be clearly expressed.'") (quoting Fiegener v. Freeman-Oak Hill Health Sys., 996 S.W.2d 767, 773 (Mo. Ct. App. 1999)). It was not.

The Merits. If the pending claims had not been released by the signed February 2004 agreement, they would nonetheless be without merit.

Plaintiff alleges that he was paid differently when "cashing out" from his SEIU employment than employees who had not filed affidavits in support of other employees' discrimination claims. Specifically, he was not paid for unused sick leave, was not paid for all his unused vacation leave, and was not paid a per diem rate when on assignment in Michigan and St. Louis.

Plaintiff has cited no direct evidence of retaliation; therefore, the McDonnell Douglas[9] burden-shifting analysis governs the Court's evaluation of his claims. See **Barker v. Missouri Dep't of Corrs.**, 513 F.3d 831, 834 (8th Cir. 2008); **Gilbert v. Des Moines Area Comm'ty College**, 495 F.3d 906, 917 (8th Cir. 2007). To establish a prima facie case of retaliation under § 1981,[10] Plaintiff must show (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between his protected activity and the adverse employment action. **Takele v. Mayo Clinic**, 576 F.3d 834, 839 (8th Cir. 2009); **Franklin v. Local 2 of the Sheet Metal Workers Int'l Ass'n**, 565 F.3d 508, 520 (8th Cir. 2009). If Plaintiff establishes his prima facie case, the burden shifts to SEIU to "articulate a legitimate, non-retaliatory reason for the adverse action . . . ." **Macias Soto v. Core-Mark Int'l, Inc.**, 521 F.3d 837, 841 (8th Cir. 2008).[11] If SEIU does so, Plaintiff has the burden of demonstrating that SEIU's reason is a pretext for retaliation. **Id.** The ultimate burden of persuasion "remains with [Plaintiff] to show the [adverse employment action] was motivated by intentional retaliation." **Id.** And, "[t]he ultimate question in any retaliation

---

[9]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[10]Title 42 U.S.C. § 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence . . . as is enjoyed by white citizens . . . ." The Supreme Court held in **CBOCS West, Inc. v. Humphries**, 128 S.Ct. 1951, 1961 (2008), that "§ 1981 encompasses claims of retaliation."

[11]**Macias Soto** was a Title VII case; however, because Title VII and § 1981 "set forth parallel, substantially identical, legal theories of recovery," the same analysis applies. **Fields v. Shelter Mut. Ins. Co.**, 520 F.3d 859, 864 n.3 (8th Cir. 2008).

case is whether the employer's adverse action against the employee was motivated by a retaliatory intent." **Wallace**, 442F.3d at 1119.

Based on the record before the Court, Plaintiff engaged in protected activity when submitting an affidavit supporting the racial discrimination complaint filed by two other SEIU employees. See **Bakhitari v. Lutz**, 507 F.3d 1132, 1137 (8th Cir. 2007) (opposition to employment practices prohibited under Title VII is protected activity). The denial of pay for accrued vacation or sick leave or for per diem reimbursements is an adverse employment action. See **Buboltz v. Residential Advantages, Inc.**, 523 F.3d 864, 868 (8th Cir. 2008) (cuts in pay or benefits are adverse employment actions). Plaintiff has not, however, established a causal connection between the adverse employment action and his affidavit. Plaintiff signed his affidavit on May 30, 2003. He was informed almost five months later, on October 20, 2003, that his position would no longer be funded as of December 31, 2003. "'Although not dispositive, the time lapse between an employee's protected activity and the employer's adverse action is an important factor when evaluating whether a causal connection has been established.'" **Van Horn v. Best Buy Stores, L.P.**, 526 F.3d 1144, 1149 (8th Cir. 2008) (quoting McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1003 (8th Cir.2005)). "Though in rare circumstances an adverse action may follow so closely upon protected conduct as to justify an inference of a causal connection between the two, . . . an interval of two months is too long to support such an inference." **Id.** Thus, the more than four month interval in Plaintiff's case does not support a causal connection

between his affidavit and the end of his employment.  See also **Recio v. Creighton Univ.**, 521 F.3d 934, 941 (8th Cir. 2008) (six month interval not close enough).  Cf. **Wallace**, 442 F.3d at 1119-20 (interval of fifteen days "strongly support[ed] an inference of causation").

Plaintiff further argues that SEIU's breach of an agreement to pay him accrued, unused vacation and sick leave was also in retaliation for his affidavit.  The interval between this alleged breach is also at least five months, using the date of the agreement as the starting date.  Moreover, there is no evidence that there was such an agreement.  The written document does not include sick leave and qualifies the amount of unused vacation leave to be paid as being consistent with SEIU policy.  Plaintiff's accurate summary of this agreement as "I [would] be paid for all unused vacation" with no reference to sick leave reinforces the absence of a commitment to pay him for such leave.[12]

Even assuming, however, that Plaintiff has established a causal connection, he has failed to carry his burden of establishing by a preponderance of the evidence that SEIU's

---

[12]Only in Plaintiff's memorandum and deposition does he refer to being paid for allegedly past-due per diem reimbursements.  His basis for believing he is owed such is unsupported by any evidence.  That basis is his belief that he had not been transferred to either Michigan or St. Louis because he never received a letter saying so and had only been on assignment.  Absent a transfer, he contends he was entitled to per diem reimbursements.  His expense reports contemporaneously submitted sought reimbursements for actual expenses, clearly indicating that he did not consider himself entitled to a per diem when working out of the Detroit or St. Louis offices.  In both locations, he lived in an apartment or home with a kitchen, yet never submitted a reimbursement request for groceries, as provided for in the SEIU policy.  He submitted per diem requests for both Michigan and St. Louis when, if his belief was genuinely held that he was entitled to per diem reimbursements unless he had a letter of transfer, he would only have submitted them for Michigan, the first office to which he was assigned after being hired in St. Louis, and not for St. Louis, the office to which he returned from his alleged assignment to Detroit.  Moreover, his consistent requests for per diem reimbursements for all workdays (and in Michigan for all seven week days), including national holidays, casts doubt on the sincerity of his belief.

proffered reason – that it was against SEIU policy to paid a terminated employee for unused sick leave or for more than ten unused vacation days carried over from previous years – was a pretext for retaliation. See **Takele**, 576 F.3d at 838. "A plaintiff may [carry this burden] by producing facts that similarly situated employees, [who did not engage in protected conduct] were treated differently." **Id.** Plaintiff argues that SEIU paid three former employees – Grant Williams; Dan Schlademan; and Becky Belcore – all their unused vacation leave and sick leave. He supports this claim with testimony that he knew what each were paid because it was the practices of managers to do so and he "was in the loop." The policy cited by SEIU was effective February 2002, after both Williams and Schlademan were terminated. Thus, they are not similarly situated employees in "all relevant respects" as required. See **McNary v. Schreiber Foods, Inc.**, 535 F.3d 765, 770 (8th Cir. 2008); **Hervey v. County of Koochiching**, 527 F.3d 711, 725 (8th Cir. 2008). Additionally, the SEIU employee responsible for calculating a departing employee's owed benefits avers that neither was paid for unused sick leave or for more than ten days accrued and carried-over vacation leave. Plaintiff's unsupported, conclusory allegation to the contrary does not present a jury issue. Nor does his deposition testimony that Williams told Plaintiff he was paid for unused sick leave create a jury issue. See **Plamp v. Mitchell School Dist. No. 17-2**, 565 F.3d 450, 460 (8th Cir. 2009) (hearsay evidence cannot defeat summary judgment); accord **Mason v. Correctional Med. Servs., Inc.**, 559 F.3d 880, 885 (8th Cir. 2009). The third employee, Belcore, was not paid for any unused leave because she did not submit the necessary report.

As noted above, when asked during his deposition whether he knew of any individuals that were treated differently than he by SEIU "[a]s far as cashout," Plaintiff replied that he did not. Also, he answered "no response" to SEIU's statement of undisputed material facts that "SEIU applied standard policy when calculating the accrued leave cash-out for former employees Williams, Belcore, and Schlademan," and "[t]his was the same process used when calculating the accrued leave cash-out for [Plaintiff]." (Def. Stat. of Facts ¶ 31.) His "no response" is deemed to be an admission. See note 2, supra. To establish that SEIU's reason for paying Plaintiff as it did, that it was in accordance with policy, was a pretext for retaliation, Plaintiff must show "*both* that the reason was false, *and* that [retaliation] was the real reason." **Dixon v. Pulaksi County Special Sch. Dist.**, 578 F.3d 862, 872 (8th Cir. 2009) (internal quotations omitted). Plaintiff has shown neither.

"The plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that h[is] protected conduct was a determinative factor in a materially adverse employment action taken by the employer." **Hervey**, 527 F.3d at 723; accord **Van Horn**, 526 F.3d at 1148. Plaintiff has not submitted the required evidence; SEIU shall be granted summary judgment on his § 1981 retaliation claim. See **Weger v. City of Ladue**, 500 F.3d 710, 728 (8th Cir. 2007) (employer's alleged retaliatory failures to give equitable compensatory time to one plaintiff who had complained of sexual harassment and equitable overtime to another plaintiff who had substantiated the first plaintiff's claims and who had

her own harassment claims were "nothing more than unsupported, conclusory allegations, which are insufficient to defeat a motion for summary judgment").

Attorney's Fees. In addition to requesting summary judgment, SEIU requests an award of attorney's fees pursuant to 42 U.S.C. § 1988.

Section 1988 authorizes an award of reasonable attorney's fees to a prevailing party in, among other actions, a § 1981 action. "A prevailing defendant, however, 'is entitled to attorney's fees only in very narrow circumstances.'" **Williams v. City of Carl Junction, Mo.**, 523 F.3d 841, 843 (8th Cir. 2008) (quoting Marquart v. Lodge 837, Int'l Ass'n of Machinists, 26 F.3d 842, 848 (8th Cir. 1994)). "'[A] plaintiff should not be assessed his opponent's attorney's fees" unless the district court 'finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" **Id.** (quoting Hughes v. Rowe, 449 U.S. 5, 15, (1980) (per curiam)) (alteration in original). Also, to support such an award, the Court must "refrain from post hoc reasoning and to view the reasonableness of the matter from the plaintiff's perspective at the time." **Flowers v. Jefferson Hospital Ass'n**, 49 F.3d 391, 392-93 (8th Cir. 1995). "[S]o long as the plaintiff has 'some basis' for [his] claim, a prevailing defendant may not recover attorney's fees." **Williams**, 523 F.3d at 843 (internal quotations omitted) (second alteration in original).

Plaintiff had some basis for believing that at least Williams, who apparently had not engaged in protected conduct,[13] was paid for unused sick leave. Thus, although this basis

---

[13]There is no allegation by SEIU that Williams did engage in protected conduct.

does not defeat SEIU's properly-supported motion for summary judgment, the Court finds it does defeat SEIU's request for attorney's fees.

### Conclusion

Plaintiff has failed to establish that there is a genuine issue of material fact as to whether he was terminated or "cashed-out" in retaliation for his affidavit in support of other SEIU employees' racial discrimination complaint. Accordingly,

**IT IS HEREBY ORDERED** that the motion for summary judgment of Service Employees International Union is **GRANTED** in part and **DENIED** in part as set forth above. [Doc. 41]

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III<br>
THOMAS C. MUMMERT, III<br>
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of October, 2009.